OLDHAM–RAMONA SCHOOL
DISTRICT # 39–5,
Appellee,

v.

Steven UST and Anita Ust, Appellants.

OLDHAM–RAMONA SCHOOL
DISTRICT # 39–5,
Appellee,

v.

E. John BRUNER and Eileen
Bruner, Appellants.

OLDHAM–RAMONA SCHOOL
DISTRICT # 39–5,
Appellee,

v.

Steven and Linda JENSEN, Appellants.

OLDHAM–RAMONA SCHOOL
DISTRICT # 39–5,
Appellee,

v.

Clint D. HOYER and Jane
K. Hoyer, Appellants.

Nos. 17982 to 17985.

Supreme Court of South Dakota.

Considered on Briefs on March 17, 1993.

Decided June 23, 1993.

Jerome B. Lammers of Lammers, Lammers, Kleibacker, Parent, Madison, for appellee.

David R. Gienapp of Gienapp and Blair, Madison, for all appellants.

MILLER, Chief Justice.

Four sets of petitioners have separately appealed circuit court judgments reinstating the Oldham–Ramona School Board's disapproval of their individual petitions for minor school district boundary changes. Due to the existence of identical issues, the four separate appeals have been consolidated for disposition in this single decision.[1]

## THE PARTIES

The four sets of petitioners are: Steven and Anita Ust (appeal # 17982); E. John and Eileen Bruner (appeal # 17983); Steven and Linda Jensen (appeal # 17984); and Clint and Jane Hoyer (appeal # 17985). The petitioners will be collectively referred to throughout this decision as "petitioners."[2] Where individual facts become pertinent, petitioners will be referred to by their surnames.

## FACTS

On December 12, 1989, voters in the old Oldham and Ramona school districts approved a school district reorganization plan merging the two districts into one effective July 1, 1990. In January and February of 1990, the legislature met and passed a series of amendments to the statutes concerning minor school district boundary changes.

---

1. The issues in this decision are similar, but not identical, to the issues in Appeal #'s 18005, 18014, *Oldham–Ramona School District v. James and Joanne Jensen,* —— N.W.2d —— (S.D. 1993). For that reason, and due to the appearance of different counsel in *Jensen, Jensen* has not been consolidated.

2. While we are normally critical of the use of such generic terminology, given the number of parties and their identical interests in these four appeals, we find the terminology acceptable for purposes of this decision.

Some of the amendments contained an emergency clause making them effective from and after the date of their passage and approval which was on February 28, 1990. *See,* 1990 S.D.Sess.L. ch. 111, § 3. The balance of the amendments were not passed with the benefit of an emergency clause, and, therefore, were not effective until July 1, 1990. *See,* 1990 S.D.Sess.L. ch. 113; SDCL 2-14-16. In March 1990, petitioners filed petitions for minor boundary changes with the new Oldham–Ramona School District. Each of the petitioners sought to transfer property from the new Oldham–Ramona District to other nearby school districts.

At the time petitioners filed their petitions, they contended that the Oldham–Ramona School Board (the board) had sixty days to act on them. This view was based on some of the amendments made to the pertinent statutes during the 1990 legislative session. However, the board took the position it was not required to take action on the petitions prior to July 1, 1990 when the school district reorganization plan took effect.

When sixty days passed with no board action on their petitions, three of the petitioners interpreted this lack of action as a disapproval of their requests for boundary changes and appealed the purported disapproval to the State Superintendent of Education. *See* SDCL 13-6-85 (Supp.1989) (appeal allowed to State Superintendent of Education from school board decision on minor boundary change). Usts and Bruners filed their appeals on June 1, 1990. Jensens filed their appeal on June 13, 1990. Hoyers did not appeal the board's initial lack of action on their petition.

On July 5, 1990, during the pendency of the three appeals to the State Superintendent, the board conducted an evidentiary hearing on all of petitioners' petitions. Petitioners were given an ample opportunity to testify and produce any evidence whatsoever in support of their petitions. However, the board took no final action on the petitions during, or immediately after, the July 5 hearing.

On August 9, 1990, the State Superintendent issued an order directing the board to take action on all of the petitioners' boundary change petitions. The board attempted to appeal this order to the circuit court but, the appeal was dismissed and the matter remanded to the State Superintendent for further proceedings.

On August 14, 1990, the board adopted a series of resolutions disapproving all of the petitioners' petitions. Petitioners then filed their second set of appeals with State Superintendent. Usts, Bruners and Jensens filed their appeals on August 20, 1990. Hoyers filed their appeal on September 6, 1990.

The State Superintendent conducted detailed evidentiary hearings on the appeals of Usts, Bruners and Jensens on November 20, and December 17, 1990. A similar hearing on Hoyers' appeal was conducted on October 1, 1990. At the end of December 1990, the State Superintendent entered findings of fact, conclusions of law and decisions in all four appeals overruling the board and granting petitioners their requested minor boundary changes.

The board appealed the decisions of the State Superintendent to the circuit court, filing its notices of appeal on January 28, 1991. Based upon motions filed by the parties, the circuit court issued orders on April 9, 1992, clarifying the standard of review to be applied in the four cases and denying petitioners' motions to restrict the admission of additional evidence. The circuit court determined that it would review the matters de novo but suggested that the parties might wish to rely on the evidence submitted during the hearings before the State Superintendent as a time saving device. That was, in fact, the course followed by the circuit court and the parties during the trial on May 7, 1992.

On June 1, 1992, the circuit court entered its findings of fact and conclusions of law in each of the four cases. The circuit court determined that the board's action in disapproving each petitioner's petition was legal and that it was not arbitrary, capricious or an abuse of discretion. Accordingly, the circuit court entered judgments in all four

cases reversing the decision of the State Superintendent and affirming and reinstating the board's disapproval of petitioners' petitions. Petitioners now appeal to this Court.

## ISSUES

Based upon a review of the briefs of all of the parties, we find that all of the issues center on the propriety of the standard of review applied to the State Superintendent's decisions by the circuit court and the merits of each petitioner's individual petition under the appropriate standard of review. Therefore, we have reframed the issues as the following two: (1) did the circuit court err in the standard of review it applied in these cases; and, (2) was the board's disapproval of each petitioner's petition clearly erroneous, arbitrary, capricious or an abuse of discretion?

## ISSUE ONE

### DID THE CIRCUIT COURT ERR IN THE STANDARD OF REVIEW IT APPLIED TO PETITIONERS' APPEALS?

■ Prior to the 1990 legislative session, this court defined the standard for judicial review of decisions of the State Superintendent on minor boundary changes as follows: "We review Superintendent's decision under the clearly erroneous standard of review and cannot reverse the decision unless we are left with a definite and firm conviction that an error has been made." *McLaughlin School Dist. 15-2 v. Kosters*, 441 N.W.2d 682, 686 (S.D.1989). *See also Shumaker v. Canova School Dist. No. 48-1*, 322 N.W.2d 869 (S.D.1982) (decision of State Superintendent on boundary change entitled to great weight and reviewing court may not substitute its judgment for that of the State Superintendent).

During the 1990 legislative session, the legislature enacted House Bill 1309 which amended SDCL 13-6-85 as follows: [3]

A boundary change, affecting not more than two percent of the assessed valuation of the school district from which the area is to be taken, may be made upon an application for a boundary change to the school board of the school district from which the area is to be taken and to the school board of the school district to which the area is to be annexed, in the form of a petition signed by over fifty percent of the voters residing in the area to be transferred by the boundary change. Copies of the petitions shall also be delivered by the petitioners to the board of county commissioners having jurisdiction over the school districts affected. Any petitioner who is aggrieved by a decision of the school board under this section may appeal that decision.

An appeal from the decision of the school board may be made to the circuit court in the time and manner specified by § 13-46-1 or to the state superintendent of education within thirty days from the date of the decision of the school board by filing a notice with the superintendent of the school board and mailing a copy thereof to the superintendent of education. The state superintendent of education shall thereafter set a time and place for the hearing and give at least ten days written notice of the hearing to the parties involved in the appeal. An appeal to the state superintendent is not a "contested case" subject to chapter 1-26; however, the appeal is subject to the provisions of § 1-26-36. An appeal from the decision of the state superintendent may be made pursuant to § 13-6-89. On appeal from a decision of the state superintendent, the appeal shall be heard and determined in the same manner as a direct appeal from the school board decision pursuant to § 13-6-89 and chapter 13-46 without any presumption of the correctness of the decision of the state superintendent nor may the provisions of § 1-26-36 be applied to the decision of the state superintendent. Nothing in this section shall affect the right of an

---

**3.** Overstrikes in the quoted passage indicate language deleted from the statute by the 1990 amendment. Underscoring indicates new language added to the statute by the 1990 amendment.

aggrieved party to appeal from the decision of the school board to the circuit court.

1990 S.D.Sess.L. ch. 113. House Bill 1309 contained no emergency clause and took effect on July 1, 1990. *See* SDCL 2–14–16 (legislative act not prescribing time when it takes effect is effective on first day of July after its passage).

The 1990 amendment of SDCL 13–6–85 changed the deference to be paid by a reviewing court in an appeal concerning a minor boundary change. No longer is any presumption of correctness to apply to the decision of the State Superintendent. Moreover, such appeals are to be heard and determined in the same manner as direct appeals from school board decisions. In that regard, SDCL 13–46–6 provides for a trial de novo of such an appeal before the circuit court.

> This trial de novo, however, is not a trial de novo in the true sense of the phrase. It is a limited type of hearing at which the circuit court takes evidence and hears testimony solely for the purpose of determining the legality, and not the propriety, of the school board's decision. It differs from a true trial de novo in that the court may not substitute its judgment for that of the school board, and the court need not justify the school board's decision by a preponderance of the evidence received.

*Moran v. Rapid City Area School Dist.*, 281 N.W.2d 595, 598 (S.D.1979) (citations omitted). *Moran* also defines the circuit court's proper standard of review in a direct appeal of a school board decision.

> The scope of the review by the circuit court is limited, then, to determining the legality of the school board's decision. In determining whether the decision was legal, the circuit court reviews the decision in two aspects. First, whether the school board acted legally, and second, whether the school board's decision was arbitrary, capricious, or an abuse of their discretion.

*Moran,* 281 N.W.2d at 599.

■ The bulk of the argument in these cases centers on which standard of review

should have been applied by the circuit court in considering the board's appeals: i.e., the standard in effect before or after July 1, 1990. In this vein, petitioners expend considerable argument to establish that they had valid appeals pending before *the State Superintendent* when the new standard for judicial review took effect on July 1, 1990. Petitioner's assert, in essence, that because they had valid appeals pending before the State Superintendent when the standard of judicial review changed, the circuit court was required to utilize the standard of review in effect before the change. We disagree.

Despite petitioners' lengthy argument and even assuming they had valid appeals pending before the State Superintendent when the standard of review changed, none of the petitioners had appeals pending before *the circuit court* at that time. The earliest these matters arguably came before the circuit court was in August of 1990 when the board attempted to appeal the State Superintendent's order that it take action on petitioners' petitions.[4] However, even this early attempt at a circuit court appeal came *after* the new standard of judicial review took effect on July 1, 1990.

■ As the circuit court reasoned, *"[t]he appeals are in effect* under the post–1990 law of de novo appeal anyway with this court to review the law that applies to the facts in the case and make its decision not bound by the superintendent's decision ..."* (emphasis added). In short, there is no issue of retroactive application of a new standard of judicial review by the circuit court in these cases because it applied the standard of review in effect when the board appealed the cases to *the circuit court* (i.e., the post-July 1, 1990 standard). As expressed in 1 Steven A. Childress & Martha S. Davis, Federal Standards of Review § 1.03 (1992):

> Generally, only final decisions are jurisdictionally appealable, except for review taken under such limited exceptions as

4. This appeal was ultimately dismissed by the circuit court as premature.

authorized interlocutory appeals or writs of mandamus. It is pointless, then, to speak initially of the standard applicable to review such an issue, since if a decision is not appealable, then no question of scrutiny, deference, or even scope is present for purposes of reviewing individual issues or findings. *Once appellate jurisdiction is established,* however, the court has to decide which of the validly appealed issues it will review (scope of review) and under what framework, scrutiny, or division of labor it will review them (standard of review). (emphasis added).

The soundness of the view that the standard of appellate judicial review is irrelevant until appellate jurisdiction is established is well represented in the prior decisions of this Court. We repeatedly define or refine standards of review as new issues come before us and apply those standards to the cases in controversy we are reviewing. *See, e.g., Maasjo v. McLaughlin School Dist. 15–2,* 489 N.W.2d 618 (S.D. 1992) (standard of review of certain school board decisions); *Janke v. Janke,* 467 N.W.2d 494 (S.D.1991) (standard of review in child support cases heard by referees); *Permann v. Dept. of Labor, Unemp. Ins. D.,* 411 N.W.2d 113 (S.D.1987) (standard of review of decisions of administrative agencies). Acceptance of petitioners' argument in the present cases would render such action by this Court a retroactive application of substantive law prohibiting application of a newly pronounced standard of review to cases initiated before the pronouncement, including the case in controversy.

■ Here, once petitioners chose to appeal the disapproval of their boundary change petitions to the State Superintendent, only his final decisions were appealable to the circuit court. SDCL 13–6–85 (Supp.1990). The State Superintendent did not issue his final decisions until the end of December 1990. The board did not appeal the State Superintendent's decisions until January 28, 1991. *By that time,* the new standard for judicial review in boundary change cases had been in effect for over

six months. That is the standard the circuit court applied in these cases and we hold that it committed no error of law in doing so.

## ISSUE TWO

### WHETHER THE BOARD'S DECISIONS WERE CLEARLY ERRONEOUS, ARBITRARY, CAPRICIOUS, OR AN ABUSE OF DISCRETION?

■ This Court's standard for reviewing circuit court decisions in appeals concerning minor boundary changes was most recently defined in *Kellogg v. Hoven School Dist. No. 53–2,* 479 N.W.2d 147, 150 (S.D. 1991): "Under the applicable rules of appellate procedure, we must affirm the circuit court unless its determinations are clearly erroneous. Therefore, the question is not whether substantial evidence in the record supports *Board,* but whether substantial evidence in the record supports the *circuit court." Kellogg,* 479 N.W.2d at 150 (emphasis original) (citations omitted).

However, we have recently clarified the applicability of the *Kellogg* standard as follows:

We now clarify that [*Kellogg*] is the appropriate standard of review when there is essentially no record for the circuit court to review.

\* \* \* \* \* \*

[T]he scope of review [in the instant case] is limited to determining the legality of the school board's decision. *Moran v. Rapid City Area Sch. Dist.,* 281 N.W.2d 595 (S.D.1979).

' "[T]he trial de novo required by SDCL 13–46–6 permits an independent inquiry into the facts, but only for the purpose of passing on the legality of board's decision." ' "The circuit court must determine (1) whether the board possessed the administrative power to make the decision (which is not in issue here), and (2) whether the board acted unreasonably or arbitrarily, or whether the board manifestly abused its discretion."

\* \* \* \* \* \*

"In determining whether the school board's decision was arbitrary, capricious

or an abuse of discretion, the circuit court must ascertain *whether there is substantial evidence to support the school board's decision.*" *Moran,* 281 N.W.2d at 599. (emphasis added). Substantial evidence means such relevant and competent evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* We must determine whether Board was clearly erroneous by examining the evidence supporting its decision.

*Maasjo,* 489 N.W.2d at 620–21 (citations omitted) (emphasis original).

Here, as in *Kellogg,* the board made no findings of fact or conclusions of law in disposing of petitioners' petitions. The only written record of the board's deliberations is a few sentences from the minutes of the August 14, 1990 board meeting when petitioners' petitions were denied. However, in contrast with *Kellogg,* an evidentiary hearing was conducted before the board and petitioners were given an opportunity to present their evidence. Extensive hearings on these petitions were also conducted by the State Superintendent. The hearings were tape recorded and later transcribed, witnesses were sworn and evidentiary objections were made. The Superintendent entered findings of fact and conclusions of law. The evidence taken by the State Superintendent was submitted by stipulation to the circuit court during its de novo hearing for purposes of supplementing the record. Moreover, as in *Maasjo,* the circuit court made clear that it was only taking evidence concerning the legality of the board's decision and that it did not intend to substitute itself for the board. Given the extensive record available for the circuit court's review and the lack of additional de novo testimony before the circuit court, we find that *Maasjo* outlines the pertinent standard for this Court's review in the instant cases.

■ Having defined the applicable standard of review, we turn our analysis to the board's decision on each petitioner's petition. Substantive factors we have previously looked to in evaluating decisions concerning minor boundary changes include:

(1) whether the petitioners are more closely aligned to the economic, social and religious life of the community into which they are being transferred; (2) whether there is bus service to the residence; (3) whether the district line which places their property in the current district was drawn in an arbitrary fashion; (4) whether petitioner's child has special needs best met in the district petitioners are attempting to join; and (5) whether the petitioners live closer to the school district they are joining as opposed to the district they are leaving. *See McLaughlin, supra; Shumaker, supra.* These factors apply to petitioners' individual cases as follows:

### USTS—Appeal # 17982

As of November, 1990, Usts had two children: Amy, age 16, a sophomore, and Maria, age 11, a sixth grader. Both children were attending school in Arlington. Usts like Arlington because it has a good music program but the new district also has a music program in which the two girls can participate. All of the extra-curricular activities the girls were involved in are also offered in the new district. Usts' residence is 12-1/2 miles from Arlington, 8 miles from Oldham and 8-1/2 miles from Ramona. Usts sell grain at Oldham, buy fertilizer and chemicals at Arlington, buy farm supplies at Madison and market some grain at Ramona. Although Usts previously attended church at Oldham, they changed to a church in Arlington in February 1990, after the school district reorganization election. Usts pay for bus service to Arlington but bus service from the new district is readily available by their residence. In fact, the older daughter drives to school. Local phone service is available between Usts' residence and the new Oldham–Ramona District. Finally, the new district is accredited academically in all respects as required by state law.

The board denied Usts' petition for a boundary change on the following basis:

[T]he Board of Education of the Oldham–Ramona School District hereby denies the petition from Steve and Anita Ust for minor boundary change. Reasons being

it is the responsibility of the Board of Education to uphold the decision of the majority of the voters. There is no educational hardship. It is the responsibility of the Board of Education to educate the students of the district and to maintain the assets of the district, assets being the land, students, and state aid. There is no mileage hardship. Granting this petition would result in a loss of state aid, county revenue, and incentive money. The breaking of ties with the community came about after the election. There has been participation on the Oldham School Board years past.

 The board did place heavy reliance on economic considerations in denying Usts' petition. We have previously criticized a school board's excessive reliance on economic factors as a basis for denial of a boundary change petition. *See, e.g., McLaughlin, supra.* "School districts do not have a vested right to retain their existing status or territory. As creatures of the legislature they are subject to periodic change, alteration, or abolishment." *Nelson v. Deuel County Board of Education,* 80 S.D. 559, 563, 128 N.W.2d 554, 556 (1964). Nevertheless, we have never held that a school district's economic interests are irrelevant in considering a boundary change petition. In fact, in reviewing a boundary change decision in *Shumaker, supra,* we took specific note of the State Superintendent's finding that the minor decrease in assessed valuation caused by the boundary change did not constitute a substantial threat to the continued viability of the school district. This suggests that a major decrease in assessed valuation could constitute a basis for denial of a petition and, therefore, that economic factors, in conjunction with the other relevant factors, are a valid consideration for a school board in ruling on a petition for a minor boundary change.

Moreover, the economic factors were not the sole factors considered by the board. *C.f., McLaughlin, supra.* The board found no educational or mileage hardships to Usts in denying their petition and further found Usts' ties with the Oldham–Ramona District were only broken after the reorga-

nization election. These findings are well supported by the facts previously outlined. Usts live closer to Oldham–Ramona than Arlington, bus service to Oldham–Ramona is readily available, all educational and extra-curricular programs of concern to Usts are available in Oldham–Ramona and Usts continue to maintain some business ties in the Oldham–Ramona District. In short, Usts' only real basis for seeking a boundary change is personal preference and the fact their children have been attending school in Arlington.

We conclude that the board properly balanced the economic considerations in granting a boundary change against the educational and mileage considerations at issue and determined that the petition should be denied. Based on the above facts, we cannot characterize that decision as clearly erroneous, arbitrary, capricious or an abuse of discretion.

### BRUNERS—APPEAL # 17983

 As of November 1990, Bruners had four children: Heather, age 15; Matt, age 14; Heidi, age 11 and Kate, age 9. The two older children were attending school at Howard and the two younger children were attending school at Oldham. Bruners began attending church in Howard in 1988 but previously attended church in Oldham. Bruners do business in Howard and Madison but have a personal bank account and some auto insurance in Oldham. Bruners also do some business at the Ramona elevator. The Bruner residence is 18 miles from Howard, 9 miles from Ramona and 8 miles from Oldham. Both the Howard bus and the Oldham–Ramona bus pick up the children and, therefore, travel is not a problem for Bruners.

The board denied Bruners' petition on the following basis:

[T]he Oldham–Ramona School District hereby denies the petition from E. John and Eileen Bruner for minor boundary change. Reasons being there is no educational hardship. There is no mileage hardship. It would result in a loss of county revenue, state aid, and incentive money. It is the responsibility of the

Board of Education to uphold the decision of the majority of the voters. Bus service will be provided. It is the responsibility of the Board of Education to educate the students of the district and to maintain the assets of the district, assets being the land, students, and state aid. There were recent ties to the Oldham community.

Here, as with Usts' petition, the board took economic factors as well as educational and mileage factors into consideration in rendering its decision. Mileage is clearly not a hardship as bus service is readily available and Bruners live closer to the Oldham–Ramona District than the Howard District. Bruners also continue to maintain some economic contacts within the Oldham–Ramona area.

In seeking the boundary change, however, Bruners also raised the issue of the special needs of their son Matt. Matt, who currently attends school in Howard, once attended school in Oldham. During that time, Matt experienced severe learning difficulties and Matt's need for special education was repeatedly tested. Since transferring to Howard, however, it has been learned that Matt does not have a learning disability but that he had no peer groups in Oldham, that he was repeatedly "picked on" and that he had a great deal of difficulty with the problem. Matt has adapted quite well in Howard, his grades are all A's and B's and no further learning disabilities have been noted.

Bruners testified before the State Superintendent that they presented Matt's problems to the board as part of the basis for seeking a boundary change. Indeed, one of the factors to be considered in ruling on a boundary change is whether the petitioner's child has special needs best met in the district petitioner's are attempting to join. *Shumaker, supra.* Yet, the board's decision on Bruners' petition fails to reflect any consideration whatsoever of this important factor. This calls into question its finding that there is no educational hardship in denial of the boundary change. The board's decision also fails to reflect any balancing of Matt's individual interests

against the school district's economic interests. In short, Matt's individual interests were "lost in the shuffle" as the board addressed eight minor boundary change petitions simultaneously. Given the board's failure to address Matt's special needs, we hold that the board's disapproval of Bruners' petition was arbitrary and capricious and, therefore, constituted an abuse of discretion.

### JENSENS—APPEAL # 17984

■ As of November 1990, Jensens had four daughters: Nicole, a freshman; Melissa, a seventh grader; Courtney, a third grader; and Jo, a first grader. Jensens' children were attending school at Lake Preston. Jensens' residence is 8 miles from Lake Preston, 5-1/2 miles from Oldham and approximately 19 miles from Ramona. Jensens attend church in Lake Preston but, prior to the school district reorganization election, they attended church in Oldham. Jensens market most of their grain at Oldham and some at Lake Preston. They buy fertilizers and chemicals in Lake Preston and utilize the veterinarian, a doctor and a bank in DeSmet. Jensens' oldest daughter is a cheerleader and plays basketball and volleyball. She also participates in track, band, and chorus. However, all of these activities are available in the new Oldham–Ramona School District. Bus service is also available from both Lake Preston and the Oldham–Ramona District. Jensens' residence is on the Oldham telephone exchange and there is local phone service between Oldham and Ramona.

The board denied Jensens' petition on the following basis:

[T]he Oldham–Ramona School District hereby denies the petition from Steve and Linda Jensen for minor boundary change. Reasons being it would result in a loss of county revenue, state aid, and incentive money. It is the responsibility of the Board of Education to uphold the decision of the majority of the voters. There is no mileage hardship. There is no educational hardship. Bus service will be provided. Granting this petition will result in a change for the 3 remain-

**584**

ing children. It is the responsibility of the Board of Education to educate the students of the district and to maintain the assets of the district, assets being land, students, and state aid. The breaking of ties with the community came about after the election.

As with Usts' petition, the board took the economic factors as well as the educational and mileage factors into consideration in denying Jensens' petition. The board's findings are supported by the facts previously outlined. There is no mileage hardship as bus service will be provided to Jensens. Although they reside nearly twenty miles from Ramona and only eight miles from Lake Preston, the twelve mile difference is not so significant as to result in much longer bus rides and Jensens raise no such contention. *Cf. McLaughlin, supra.* There is no educational hardship as the Oldham–Ramona School District is accredited academically and all of the extracurricular programs mentioned in Jensens' brief are available in Oldham–Ramona. Although Jensens mention having some relatives in Lake Preston, that does not appear to have been a significant consideration in their reasons for seeking a boundary change and they continue to maintain business and economic contacts within the Oldham–Ramona area. In short, like Usts, it appears Jensens' sole basis for seeking attachment to the Lake Preston School District is personal preference.

Because the board weighed the appropriate factors in considering Jensens' petition, we do not find its disapproval of the petition clearly erroneous, arbitrary, capricious or an abuse of discretion.

### HOYERS—APPEAL # 17985

In October 1990, Hoyers had three children, ages 5, 3 and 2. None of the children were attending school in 1990. The Hoyer residence is 8-1/2 miles from Oldham, 10 miles from Ramona and 16 miles from Howard. Bus service is available to the Oldham–Ramona School District. Hoyers are on the Oldham telephone exchange.

The board denied Hoyers petition on the following basis:

[T]he Board of Education of the Oldham–Ramona School District hereby denies the petition from Clint and Jane Hoyer for minor boundary change. Reasons being there is no educational hardship. There is no mileage hardship. It is the responsibility of the Board of Education to uphold the decision of the majority of the voters. It would result in a loss of county revenue and state aid. It is the responsibility of the Board of Education to educate the students of the district and to maintain the assets of the district, assets being land, students, and state aid.

As with Usts' and Jensens' petitions, the board took the economic factors as well as the educational and mileage factors into consideration in denying Hoyers' petition. The board's findings are supported by the facts previously outlined. Although Hoyers' claim significant family and economic ties to Howard, there is no mileage hardship as bus service is provided by the Oldham–Ramona District and Hoyers live closer to the Oldham and Ramona communities than they do to Howard. There is no educational hardship as the Oldham–Ramona School District is accredited academically in all respects as required by state law and Hoyers point to no educational programs they need that are not available in the Oldham–Ramona schools. Hoyers do place heavy emphasis on their family relations in Howard and the fact some family babysitting services are utilized. However, there is no indication in the record that these are essential services that would be curtailed by the children's attendance at the Oldham–Ramona schools or would cause a severe economic hardship for the family.

Because the board weighed the appropriate factors in considering Hoyers' petition, we decline to characterize its decision as clearly erroneous, arbitrary, capricious or an abuse of discretion.

### CONCLUSION

We affirm in Appeal #'s: 17982, Oldham–Ramona School Dist. v. Ust; 17984, Oldham–Ramona School Dist. v. Jensen; and, # 17985, Oldham–Ramona School Dist.

v. Hoyer. We reverse in Appeal # 17983, Oldham–Ramona School Dist. v. Bruner.

HENDERSON and AMUNDSON, JJ., concur.

WUEST and SABERS, JJ., concur in part and dissent in part.

SABERS, Justice (concurring in part & dissenting in part).

I concur in *Ust*, # 17982, *Jensen*, # 17984, and *Hoyer*, # 17985, because the board's decisions were clearly not illegal or erroneous, arbitrary, capricious, or an abuse of discretion. *Maasjo*, 489 N.W.2d at 621; *Kellogg*, 479 N.W.2d at 149; *Shumaker*, 322 N.W.2d at 872; *Dale v. Bd. of Educ.*, 316 N.W.2d 108, 113–14 (S.D.1982); *Moran*, 281 N.W.2d at 599.

I dissent in *Bruner*, # 17983, because the board's decision was clearly not illegal or erroneous, arbitrary, capricious or an abuse of discretion as determined by the majority. *Id.* In my view, it is the majority's decision that is "erroneous, arbitrary, capricious or an abuse of discretion." This is clear from a reading of the majority opinion.

The basis of the majority's reversal appears to be that "the board's decision on Bruners' petition fails to reflect any consideration whatsoever" of "Matt's problems" and "special needs." This is surprising in view of the fact that the majority had just announced that "[s]ince transferring to Howard, however, it has been learned that Matt does *not* have a learning disability[.]" (Emphasis added).

The majority opinion also states "[m]oreover, as in *Maasjo*, the circuit court made clear that it was only taking evidence concerning the legality of the board's decision and that it did not intend to substitute itself for the board." Would an objective reader have to say that the majority is giving lip service to *Maasjo* ("scope of review is limited to determining the legality of the school board's decision[,]" *Maasjo*, 489 N.W.2d at 621 (citation omitted)), while overruling *Dale*? ("The trial de novo required by SDCL 13–46–6 permits an independent inquiry into the facts, but only for

the purpose of passing on the legality of the board's decision. *It does not mean that the court may substitute its judgment for that of the board* [.]" *Dale*, 316 N.W.2d at 111 (emphasis added).) All this, without even saying so.

There is sufficient evidence to support the board's decision and we should say so. That is what the circuit court did and, in this instance, we should follow suit. ("In determining whether the school board's decision was arbitrary, capricious or an abuse of discretion, the circuit court must ascertain whether there is substantial evidence to support the school board's decision.... We must determine whether Board was clearly erroneous by examining the evidence supporting its decision." *Maasjo*, 489 N.W.2d at 621 (emphasis omitted) (citation omitted).)

Finally, if the majority is right that "the board's decision ... fail[ed] to reflect any consideration whatsoever of this important factor[, special needs,] [which] calls into question its finding that there is no educational hardship in denial of the boundary change[,]" then we should reverse and remand for the school board to consider the factor or factors claimed to have been overlooked. SDCL 1–26–36 provides in part:

The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. *The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced* because the administrative findings, inferences, conclusions, or decisions are:

(1) In violation of constitutional or statutory provisions;

(2) In excess of the statutory authority of the agency;

(3) Made upon unlawful procedure;

(4) Affected by other error of law;

(5) Clearly erroneous in light of the entire evidence in the record; or

(6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

(Emphasis added). Obviously, we should not sua sponte grant the boundary change because, if we do, we are *really* substituting ourselves for the board. *See Dale*, 316 N.W.2d at 111.

WUEST, J., joins this special writing.